United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAYEED RAHMAN,
Petitioner,
v.
SERGIO ALBARRAN, et al.,
Respondents.

Case No. 4:26-cv-13708-HSG

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND PERMANENT INJUNCTION AND DENYING MOTION TO PROCEED UNDER PSEUDONYM**

Dkt. Nos. 16, 18

Petitioner Rayeed Rahman previously moved the Court for a temporary restraining order ("TRO") that would, among other things, require his immediate release from ongoing detention by agents of Immigration and Customs Enforcement ("ICE") and prohibit ICE from re-arresting him without notice and a pre-detention bond hearing. *See* Dkt. No. 4. The Court granted in part the motion for a TRO. *See* Dkt. No. 6 ("TRO Order"). In doing so, the Court ordered Respondents[1] to show cause why a preliminary injunction should not issue. *See id.* at 6. During the hearing, the parties agreed that rather than file a separate preliminary injunction order, the Court could resolve the underlying habeas petition on the current record.

## I. BACKGROUND

### A. Factual Background

According to the record before the Court, Petitioner was born in Bangladesh in 2004 and came to the United States in 2013 on a B-2 visitor visa. *See* Dkt. No. 4-1 ("Shastri Decl.") at ¶ 2.

---

[1] Respondents include Sergio Albarran, in his official capacity as Acting Field Office Director of the San Francisco ICE Field Office; David J. Venturella, in his official capacity as Acting Director of ICE; Markwayne Mullin, in his official capacity as Secretary of Homeland Security; and Todd Blanche, in his official capacity as U.S. Attorney General. *See generally* Dkt. No. 16 (Amended Petition).

Petitioner's father filed an affirmative application for asylum with U.S. Citizenship and Immigration Services ("USCIS"), listing Petitioner as a derivative. *Id.* at ¶ 3. USCIS has not scheduled Petitioner or his family for an asylum interview. *See* Dkt. No. 16-1 ("Second Shastri Decl.") at ¶ 3. However, since approximately 2016, USCIS has issued Petitioner employment authorization based on the pending asylum application. Shastri Decl. at ¶ 3. He appears to have no criminal history in the United States or anywhere else in the world, as Respondents at least implicitly acknowledge. *Id.* at ¶ 7; *see also* Dkt. No. 17-2, Ex. 2 at 33 ("As of November 13, 2026, the subject has no criminal history.").[2]

On November 13, 2026, Petitioner flew from John F. Kennedy International Airport to San Francisco International Airport. *See* Dkt. No. 19-1 ("Rahman Decl.") at ¶ 2. When he disembarked, a person in plainclothes approached Petitioner and asked if he was Rayeed Rahman. *See id.* Petitioner thought that the person may have been affiliated with the airport or airline, and said yes. *Id.* The person asked for his identification, and when Petitioner refused to provide it and started to walk away, the person said "they would hold [him] down" if he did not comply. *Id.* The person briefly showed Petitioner an ICE badge and again demanded Petitioner's identification. *Id.* A second ICE officer joined. *Id.* at ¶ 3. The ICE officers confirmed that Petitioner was being detained and gave him a copy of an arrest warrant. *Id.*; *see also* Dkt. No. 16-2, Ex. A (copy of Form I-200); Dkt. No. 27-2, Exs. A–B (refiled copies of Form I-200).[3]

The officers initially told Petitioner that he was being taken to "630 Sansome Street" for processing. *Id.* at ¶ 5. While still at the airport, Petitioner called family and friends to alert them, and the ICE officers allowed Petitioner to meet his partner outside the airport terminal to give her some of his personal belongings. *Id.* The officers then placed Petitioner in a black SUV and handcuffed him. *Id.* According to Petitioner, the officers then made multiple stops, changed vehicles several times, and picked up other detainees. *Id.* at ¶ 6. After being taken to an Alameda

---

[2] For ease of reference, the Court has used the PDF pagination unless otherwise indicated.

[3] In Petitioner's supplemental filing after the hearing, he explained that the initial Form I-200 he received did not have any boxes checked regarding the basis for the probable cause determination in his case. *See* Dkt. No. 27-1 at ¶¶ 2–4; Dkt. No. 27-2, Ex. A. The ICE officer only checked the boxes on the form after Petitioner asked him to identify the reasons for his arrest on the form. *See* Dkt. No. 27-1 at ¶¶ 2–4; Dkt. No. 27-2, Ex. B.

parking lot and put in another van, Petitioner states that he was then taken to the Stockton Enforcement and Removal Operations ("ERO") office. *Id.* When he arrived there, the clock in the office read 2:00 p.m. *Id.* Petitioner was placed in a cell, and his repeated requests to speak with his lawyer were denied. *Id.* at ¶¶ 7–9, 13. He was told to sign paperwork, and when he again asked to speak with a lawyer, he was told that his belongings would become a "donation" and he would be reported as "uncooperative and resistant" if he did not sign. *Id.* at ¶ 8.

At approximately 10:30 or 11:00 p.m.—after the Court had issued the TRO order—Petitioner was again placed in restraints and transported to a nearby airport where he was flown to Bakersfield. *Id.* at ¶ 10. He was told that he was initially supposed to go to Texas, but that there was a change of plans and he would be returned to Stockton instead. *Id.* In the early morning of November 14, 2026, Petitioner was driven to the Fresno ICE office. *Id.* at ¶ 12. Petitioner states that there were no officers available for intake at the time, so officers drove Petitioner around for another hour until approximately 7:30 a.m. *Id.* at ¶ 12. At noon, Petitioner was driven from Fresno back to the Stockton ERO office. *Id.* at ¶ 13. Only once he returned to the Stockton office was he told that he would be released and allowed to contact his lawyer. *Id.* at ¶ 14. He was given a copy of a Notice to Appear, a Notice of Custody Determination, and a second arrest warrant. *Id.*; *see also* Dkt. No. 16-2, Exs. B–C.

**B. Procedural Background**

Petitioner, through counsel, filed a petition for writ of habeas corpus and a complaint for declaratory and injunctive relief on Friday, November 13, 2026, at 12:19 p.m. *See* Dkt. No. 1. Petitioner then filed the TRO application at approximately 5:50 p.m., *see* Dkt. No. 4, and the Court issued its order granting in part the TRO, and requiring Petitioner's immediate release, at 9:22 p.m., *see* TRO Order. The Court ordered Respondents to show cause why a preliminary injunction should not issue, and set a briefing schedule and a hearing. *See id.* at 6. The Court received confirmation that Petitioner has been released on November 14, 2026, at approximately 1:39 p.m. *See* Dkt. No. 13. The Court held a hearing on November 19, 2026. *See* Dkt. No. 26 (minute order).

//

United States District Court
Northern District of California

## II. MOTION TO PROCEED UNDER A PSEUDONYM

In addition to his habeas petition, Petitioner has filed a motion to proceed under a pseudonym. Dkt. No. 18. He argues that this is necessary "to protect his identity from public disclosure and to prevent future potential harm from the government of Bangladesh." *Id.* at 1. Although Petitioner has stated that he is a derivative on his father's affirmative application for asylum, this case does not disclose any details about that application. In his motion to proceed under a pseudonym, Petitioner generically states that if his "full name bec[a]me known, he may be subjected to harassment and persecution by the Bangladeshi government if forced to return to Bangladesh." *See id.* at 4–5. However, Petitioner has not provided any specific information to enable the Court to evaluate the severity of the threatened harm he faces, the reasonableness of his fears, or his vulnerability to such retaliation. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000) (identifying factors district courts should consider when evaluating need for anonymity). The Court thus **DENIES** the motion to proceed under pseudonym and turns to the merits of the habeas petition.

## III. LEGAL STANDARD

Absent suspension, the writ of habeas corpus is available under the Constitution "to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., art. I, § 9, cl. 2). It is "a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law." *Id.*; *see also Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he traditional function of the writ is to secure release from illegal custody."). Accordingly, a federal district court may grant a writ of habeas corpus if the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A district court's habeas jurisdiction includes challenges to immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001).

## IV. DISCUSSION

In their brief, Respondents reference the limited time they had to prepare their materials. *See, e.g.*, Dkt. No. 17 at 6 ("Due to the timing of Respondents' notice of this action and the Court's deadline for a response, Respondents cannot obtain accurate evidence regarding

specifically where Petitioner was at the time of filing."); *id.* at 12 ("Given Respondents' limited time to respond to Petitioner's TRO motion, they are unable to evaluate [Petitioner's] allegations by referencing USCIS records . . . ."). As the Court stated in its prior order, however, this is entirely a problem of Respondents' own making. *See* TRO Order at 1, n.1. It was "Respondents' decision to arrest Petitioner with no warning after he has lived in the United States for years without incident," *id.*, and to do so on a Friday when it may have been more difficult to obtain declarations and documentation in response to Petitioner's motion and the Court's order. The Court further notes that during the November 19 hearing, counsel for Respondents did not have any additional information to provide and agreed that the Court could decide the habeas petition on the current record.

Petitioner's amended petition includes several causes of action, including a procedural due process claim. *See* Dkt. No. 16 at 30–31 (¶¶ 89–102).[4] Specifically, Petitioner challenges the government's ability to arrest him without notice and a hearing before a neutral decisionmaker prior to any detention. *See id.* In opposition, Respondents contend that the Court lacks jurisdiction; that due process does not attach because Petitioner has no liberty interest; and that regardless, Petitioner is not entitled to the process he now seeks. *See* Dkt. No. 17. As discussed in the TRO Order, and more fully below, the Court is unpersuaded by Respondents' arguments.[5]

**A. Jurisdiction**

Respondents first argue that the Court "likely" lacks jurisdiction to hear Petitioner's claim. *See* Dkt. No. 17 at 6–8. Specifically, Respondents assert that at the time Petitioner filed the habeas petition in this case he "likely" was either located in Stockton, California, outside this district, or on his way there. *See id.* Respondents raised this argument shortly after the Court issued the TRO Order. *See* Dkt. No. 8. The Court rejected the argument then, Dkt, No. 10, and rejects it again now.

---

[4] The Court notes that the Amended Habeas Petition does not appear to contain consecutively numbered paragraphs. Pages 28 and 29 of the PDF include ¶ 93, but the First Cause of Action which follows begins at ¶ 82.

[5] Because the Court agrees with Petitioner that his Due Process rights were violated and finds that a permanent injunction is warranted under the circumstances, the Court does not address Petitioner's remaining arguments.

"District courts are limited to granting habeas relief 'within their respective jurisdictions.'" *Rumsfeld v. Padilla*, 542 U.S. 426, 442 (2004) (quoting 28 U.S.C. § 2241(a)). And as a corollary, "jurisdiction lies in only one district: the district of confinement." *Id.* at 443. Nevertheless, "when the Government moves a habeas petitioner after []he properly files a petition naming h[is] immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Id.* at 441 (citing *Ex parte Endo*, 323 U.S. 283, 295 (1944)).

Here, ICE officers arrested Petitioner at the San Francisco International airport—within this district—at approximately 9:30 a.m. on November 13, 2026. *See* Second Shastri Decl. at ¶ 7; *see also* Dkt. No. 17-2, Ex. 2 at 32. Petitioner was told at the time of his arrest that he was being taken to "630 Sansome Street"—the ICE San Francisco field office—for processing. Rahman Decl. at ¶ 5. While still at the airport, Petitioner relayed this information to family and friends by cell phone and in person to his partner outside the airport terminal. *Id.* Based on this information, and less than three hours later, counsel filed the habeas petition at 12:19 p.m. in this district, naming, as relevant here, the Acting Field Office Director of the San Francisco ICE Field Office as a Respondent. *See* Dkt. No. 1.

Respondents acknowledge that they did not "obtain accurate evidence regarding specifically where Petitioner was at the time of filing." *See* Dkt. No. 17 at 6. None of the documents they provide indicate that Petitioner was at the Stockton facility by 12:19 p.m. or had left this district by that time. In contrast, Petitioner has provided a description of a circuitous trip from the airport to the Stockton ERO facility. *See* Rahman Decl. at ¶¶ 5–6. And Petitioner specifically recalls seeing a clock that said 2:00 p.m. when he arrived in Stockton—nearly two hours after the petition was filed.[6] *See id.* at ¶ 6. The Court finds this evidence sufficient to conclude that Petitioner was still within the district when his habeas petition was filed.[7]

---

[6] During the hearing, counsel for Respondents stated that he had no information to contradict Petitioner's asserted facts.

[7] Given Petitioner's description of the multiple stops and vehicle changes on the way from the airport to the Stockton facility, and counsel for Respondents' indication at the hearing that contractors are often used for such transport, the Court notes that alternatively, an exception to the immediate custodian and district of confinement rules likely applies. It is not clear how any

Respondents also argue that the Court may not review ICE's "discretionary" decision to detain Petitioner. *See* Dkt. No. 17 at 5–6. Under § 1226(e):

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole.

8 U.S.C. § 1226(e). However, as Respondents themselves acknowledge, the Ninth Circuit has held that § 1226(e) "does not include constitutional claims or questions of law." *See Martinez v. Clark*, 124 F.4th 775, 782 (9th Cir. 2024). Petitioner is explicitly challenging the constitutionality of Respondents' conduct, and not any discretionary decision under § 1226(a).

**B. Due Process Claim**

As relevant here, 8 U.S.C. § 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." Pending such a decision, the Attorney General "may continue to detain the arrested alien" or "may release the alien" on bond or conditional parole. 8 U.S.C. § 1226(a)(1)–(2). Respondents argue that Petitioner was arrested and detained under § 1226(a), and thus was not entitled to any pre-detention hearing. *See* Dkt. no. 17 at 11–14. However, the Court agrees with Petitioner that § 1226(a) is still limited by principles of due process. *Cf. Zadvydas*, 533 U.S. at 690–99 (interpreting 8 U.S.C. § 1231(a)(6), the post-removal detention provision, "to contain an implicit 'reasonable time limitation'" to avoid "serious constitutional problem").

As discussed in the TRO Order, the Due Process Clause of the Fifth Amendment protects all persons within the United States from being "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government

---

diligent attorney could have tracked or anticipated Petitioner's route. Not only was Petitioner's exact location and immediate custodian unknown to his counsel at the time the petition was filed, but these details appear unknown to Respondents even now. In short, Petitioner was "held in an undisclosed location by an unknown custodian" such that it would be "impossible to apply the immediate custodian and district of confinement rules." *Padilla*, 542 U.S. at 450, n.18 (citing *Demjanjuk v. Meese*, 784 F.2d 1114, 1115–16 (D.C. Cir. 1986)).

United States District Court
Northern District of California

custody, detention, or other forms of physical constraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. "Even individuals who face significant constraints on their liberty or over whose liberty the government wields significant discretion retain a protected interest in their liberty." *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) (collecting cases). The Due Process Clause applies to noncitizens within the United States "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693.

In determining what process is due, the Court applies the test under *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Orozco Acosta v. Bondi*, No. 25-CV-09601-HSG, 2025 WL 3229097, at *2–4 (N.D. Cal. Nov. 19, 2025); *accord Pinchi*, 792 F. Supp. 3d at 1031 (collecting cases). As discussed at the hearing, cases like this one are being filed regularly in this district and around the country, but at this point courts have little guidance as they seek to determine what due process requires under such circumstances. Still, the Court finds that Petitioner here has a substantial liberty interest in remaining out of custody, the risk of erroneous deprivation is high, and the government's countervailing interests are low.

**i. Protected Liberty Interest**

Petitioner has a substantial liberty interest in remaining out of custody and free from detention given that he has lived in the United States since he was nine years old, he completed his education and began a career here, and has lived in the country for thirteen years without incident and without being detained. The government has known of Petitioner's presence throughout this time, as he initially entered lawfully on a B-2 visa and applied for asylum through his father's affirmative application. Respondents did not detain Petitioner after his B-2 status expired in June 2014. Instead, the government has continued to issue him employment authorizations since approximately 2016. *See, e.g.*, *Kharitonova v. Albarran*, No. 3:26-CV-01362-JSC, 2026 WL 531441, at *2 (N.D. Cal. Feb. 25, 2026) (rejecting as "specious" government argument that petitioner lacked liberty interest where government did not previously seek to detain her while asylum application pending); *cf. Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (finding parolee relied on "implicit promise" of continued liberty provided he complies with imposed conditions,

and his liberty interest thus "is valuable and must be seen as within the protection of the Fourteenth Amendment"). The Court disagrees with Respondents' suggestion that these circumstances and this course of conduct can fairly be construed as simple "bureaucratic neglect." Dkt. No. 17 at 12 (quoting *Wang v. Janecha*, No. 5:26-CV-4447-BFM, 2026 WL 2584800, at *2 (C.D. Cal. Aug. 31, 2026)).

**ii. *Mathews Factors***

Against Petitioner's substantial liberty interest already discussed above, the Court must weigh (1) the risk of an erroneous deprivation under the procedures used and the probable value of any additional or substitute procedural safeguards; and (2) the government's interest. *See Mathews*, 424 U.S. at 335. The Court continues to find the risk of erroneous deprivation here is high and the government's interest is low. As another court succinctly explained, the difference between a pre-deprivation and post-deprivation hearing is significant:

> A pre-deprivation hearing enables a noncitizen to retain their full liberty prior to the hearing, and moreover, it is precisely that liberty that provides the noncitizen full access to their resources and independence which may be crucial to preparing an adequate defense for the hearing. In contrast, a post-deprivation hearing given only upon the noncitizen's request deprives the noncitizen of their liberty throughout three requisite procedural steps: the noncitizen becomes informed of their right to seek a hearing if not already so informed, the noncitizen requests a hearing, and a hearing is provided. Further, the circumstance of detention necessarily hinders the noncitizen's ability to adequately prepare to defend [himself] because []he is physically separated from resources and entirely dependent on the mechanisms, protocols, and discretion of the government's detention facilities and operators.

*Oliveira Tinovo v. Albarran*, No. 1:26-CV-05505-DC-CKD (HC), 2026 WL 2949219, at *6 (E.D. Cal. Oct. 1, 2026) (cleaned up). Such limitations are underscored here, where Petitioner was provided limited information by ICE officers and had to affirmatively ask them to identify the reason for his arrest on the initial Form I-200 provided at the airport, he was repeatedly denied access to his lawyer, and he was not told about the Court's TRO Order or his release for hours after it had issued. *See* Dkt. No. 27-1 at ¶¶ 2–4.

Respondents argue that § 1226(a) nevertheless provides sufficient procedural protections

to satisfy due process. Dkt. No. 17 at 14–16. Citing the Ninth Circuit's opinion in *Rodriguez Diaz v. Garland*, Respondents state that the risk of erroneous deprivation is "relatively small" given the "extensive [post-deprivation] procedural protections" under § 1226(a). *Id.* (quoting 53 F.4th 1189, 1202, 1210–11 (9th Cir. 2022)). However, the Ninth Circuit in *Rodriguez Diaz* considered whether the petitioner, "who had an extensive criminal history," and who an immigration judge had already found "presented a danger to the community due to his gang affiliation" was entitled to a second bond hearing at which the government would bear the burden of proof by clear and convincing evidence. *See* 53 F.4th at 1193. In finding that § 1226(a)'s procedures satisfied due process under such circumstances, the court explicitly stated that "[i]n so holding, we do not foreclose all as-applied challenges to § 1226(a)'s procedures." *Id.* at 1213. The case says nothing about whether the post-deprivation procedures in § 1226(a) are sufficient to protect the liberty interests of someone like Petitioner who has spent over a decade in the country, has been issued employment authorization based on a pending asylum application, and has no criminal history.

Respondents do not identify any other persuasive countervailing interest in detaining Petitioner without first holding a hearing. The Supreme Court has stressed that civil detention is nonpunitive, and is generally only permissible to protect against danger to the community or to prevent a flight risk. *See Zadvydas*, 533 U.S. at 690–91. Petitioner's detention here is not likely to serve either purpose where he has no criminal history and has stable employment and significant ties to the United States. Moreover, detention for its own sake is not a legitimate governmental interest. *See Pinchi*, 792 F. Supp. 3d at 1036 ("Detention for its own sake, to meet an administrative quota, or because the government has not yet established constitutionally required pre-detention procedures is not a legitimate government interest."). Should Respondents still wish to detain Petitioner, they can provide a hearing before a neutral decisionmaker. "In immigration court, custody hearings are routine and impose a minimal cost." *Singh v. Andrews*, 803 F. Supp. 3d 1035, 1048 (E.D. Cal. 2025) (cleaned up). Under the circumstances, the Court finds that all three *Mathews* factors weigh in favor Petitioner such that a hearing is warranted before his re-arrest or detention.

United States District Court
Northern District of California

**iii. Neutral Adjudicator**

As the Court stated in the TRO Order, Petitioner requests that he be released and receive a pre-detention hearing "before this Court" rather than before an immigration judge. *See* Dkt. No. 4 at 17–21; *see also* Dkt. No. 16 at ¶¶ 87–93. At bottom, Petitioner argues that there is an "inherent lack of fairness in the Immigration Court system." Dkt. No. 4 at 17. Petitioner does not provide adequate authority for this request (and certainly provides no basis for a federal court to adopt the extraordinary rationale underlying it), and the Court therefore **DENIES** Petitioner's request.

## V. CONCLUSION

Petitioner's habeas petition is **GRANTED**. Dkt. No. 16. The Government is **ENJOINED AND RESTRAINED** from re-detaining Petitioner in any form (including, but not limited to, for purposes of executing a removal) without notice and a pre-deprivation hearing before a neutral decisionmaker. The Court **DENIES** the motion to proceed under a pseudonym. Dkt. No. 18. The Clerk is directed to enter judgment in favor of Petitioner and to close the case.

**IT IS SO ORDERED.**

Dated: November 25, 2026

Haywood S. Gilliam, Jr.
HAYWOOD S. GILLIAM, JR.
United States District Judge